### AFFIDAVIT OF SPECIAL AGENT JOSHUA A. MCLEOD IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Joshua A. McLeod state:

### Introduction and Agent Background

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI).  I have been employed by the FBI since January 2016.  I am currently assigned to the FBI Jacksonville Field Office's Criminal Enterprise Investigations Task Force (CEITF) and Violent Crime Major Offenders (VCMO) Squad, which is comprised of law enforcement officers from the FBI, Jacksonville Sheriff's Office (JSO), and other local Law Enforcement Agencies.  As a member of the CEITF/VCMO Squad, I am responsible for investigating drug trafficking, fugitive matters, firearms offenses, kidnappings, murders, robberies, extortion, and other violent crimes.  My investigations have included but not been limited to the use of surveillance and sophisticated techniques, and the execution of search, seizure, and arrest warrants.  Prior to my assignment in the Jacksonville Field Office, I was assigned to the San Juan Field Office, where I worked on the San Juan Violent Gangs and Transnational Organized Crime squad, amongst other criminal investigations.  Prior to my employment with the FBI, I was employed with the Florida Highway Patrol, from June 2002 until December 2015. As a State Trooper/Law Enforcement Officer, I primarily worked felony criminal violations with a focus on narcotics and contraband interdiction. I often assisted on various search warrants and conducted arrests for violations associated with illicit criminal activity.

2.      During my instruction at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.   As a State Trooper in Florida, I participated in numerous search warrants for the purpose of investigating violent criminal and drug

trafficking violations. I have also attended a plethora of training courses, including training on advanced narcotics investigations and other various criminal violations during my tenure as a State Trooper.

3.      I am currently investigating CHRISTOPHER DOZIER for, among other things, Hobbs Act robbery, in violation of 18 U.S.C. § 1951, use of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c).

4.      This affidavit is being submitted in support of an application for a warrant to search electronic equipment, specifically a mobile phone ("the equipment") that is in the possession of law enforcement investigators, as described in Attachment A to the proposed warrant. There is probable cause to believe that the equipment contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B to the proposed warrant.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

**Probable Cause to Believe That a Federal Crime Was Committed**

6.      On June 21, 2019, Detective John Hanson, who is a detective with the JSO and a Task Force Officer with FBI/VCMO, contacted me and requested my assistance with the investigation of CHRISTOPHER DOZIER for armed robberies in the Jacksonville area. Based on several discussions I had with Detective Hanson in June 2019 and July 2019, and my review of JSO reports generated in connection with the investigation, I determined that on May 24, 2019, a black male suspect committed an armed robbery of the "777 Arcade" (a gambling/game room) located at 2465 New Berlin Road, Jacksonville, Florida, in the Middle District of Florida. In the

course of the robbery, the suspect and an employee of 777 Arcade were involved in a physical struggle, during which the suspect struck the employee, and brandished a small black revolver and pointed it at the employee. The suspect held the employee at gunpoint while removing cash from the register. The suspect subsequently bound the employee's hands together with a spool of wire and took her cell phone. The suspect fled, entering the passenger side of a Green Ford Explorer being driven by an unknown accomplice, which was waiting outside, positioned in a manner to serve as a lookout and getaway vehicle. JSO obtained images of the suspect from the 777 Arcade video surveillance system.

7.  Based on discussions I had with Detective Hanson in June 2019 and July 2019 and my review of JSO reports generated in connection with the investigation, I determined that on June 19, 2019, a black male suspect committed an armed robbery of the "Best Arcade" (a gambling/game room) located at 1440 Dunn Avenue, Jacksonville, Florida, in the Middle District of Florida. The suspect entered the business, put a small black revolver to a security guard's head, and disarmed the guard of his pistol. The suspect then took cash from the arcade's office and fled the business, entering the passenger side of a dark-colored sedan being driven by an unknown accomplice, which was waiting outside, positioned in a manner to serve as a lookout and getaway vehicle. JSO obtained images of the suspect were obtained from the Best Arcade video surveillance system.

8.  I have reviewed the images of the suspect obtained from the surveillance systems at the 777 Arcade and the Best Arcade and determined that they show the same individual.

9.  Detective Hanson has informed me that photographs of the suspect from the surveillance video were released via the media, and on May 31, 2019, an anonymous tip provided the name CHRISTOPHER DOZIER as a potential suspect in the 777 Arcade robbery. Based on

discussions I had with Detective Hanson in June and July 2019 and my review of JSO reports generated in connection with the investigation, I determined that JSO obtained social media images of DOZIER from open source research. In one such photo, DOZIER is observed with a distinct tattoo on his left shoulder, which resembles a tattoo that is visible on the left shoulder of the suspect in the surveillance video from the 777 Arcade robbery.

10. I have also reviewed records obtained through a computerized query of the Florida Department of Highway Safety and Motor Vehicles Driver and Vehicle Identification Database (DAVID) for DOZIER. Those records indicate that DOZIER has a Florida driver's license, and the person depicted in the driver's license photo resembles the suspect depicted in the surveillance video from both robberies.

11. On June 21, 2019, JSO Robbery Detectives H. Taylor and D. Smith interviewed DOZIER's mother, Robin Ghent. Detectives Taylor and Smith have informed me of the substance of their interview. The detectives provided Ms. Ghent with still photographs of the suspect taken from the surveillance videos in both robberies. Ms. Ghent identified the person in both photographs as being her son, DOZIER. She declined to sign the photographs, but stated that she would call DOZIER and tell him to turn himself in to police. Ms. Ghent informed Detectives Taylor and Smith that if DOZIER had fled Jacksonville, he would likely go to the Boston, Massachusetts area.

12. On June 25, 2019, Detectives Hanson and Taylor interviewed James Byrd, Jr. They have informed me of the substance of their interview. Mr. Byrd informed the detectives that his daughter, Brittney, has been intermittently involved in a romantic relationship with DOZIER for several years, and that DOZIER had been to Mr. Byrd's house numerous times. The detectives showed Mr. Byrd still photographs of the suspect taken from the surveillance videos in

4

both robberies, and Mr. Byrd identified the suspect as DOZIER, signing both photos. Detectives Hanson and Taylor also spoke to Brittney Byrd, and informed me of the substance of that interview. Ms. Byrd refused to identify DOZIER as the individual in the photographs, but asked what he had done. The detectives asked Ms. Byrd if DOZIER possessed a firearm, and she informed the officers DOZIER has a small black revolver that she believed to be .22 caliber.

13. On July 15, 2019, JSO Officer C. Berry went to addresses in Jacksonville that DOZIER is known to frequent. During one such visit, Officer Berry spoke with DOZIER'S grandmother, and he informed me of the substance of that interview. DOZIER'S grandmother informed Officer Berry that DOZIER was arrested in Quincy, Massachusetts on June 29, 2019, and is currently incarcerated at the Norfolk County Sheriff's Office jail.

14. Detective Hanson obtained the state arrest report for DOZIER from the Quincy Police Department (QPD). I have reviewed that report, and determined that DOZIER was arrested for a weapons offense, narcotics possession, and resisting arrest. I reviewed photographs of the firearm collected at the time of DOZIER's arrest, which depict a small black .22 caliber revolver with a wooden grip. I compared these photographs with the surveillance images obtained from the 777 Arcade robbery and determined that the gun DOZIER was arrested with in Quincy, Massachusetts resembles the gun utilized during the robberies in Jacksonville, Florida.

15. On July 23, 2019, Detective Hanson obtained records from the Greyhound bus station in Jacksonville, Florida. I have reviewed those records, which indicate that DOZIER purchased a Greyhound bus ticket from Jacksonville, Florida to New York on June 21, 2019, the same day that Detectives Taylor and Smith met with DOZIER's mother. On July 24, 2019, Detective Taylor obtained surveillance footage from Greyhound for the ticket purchase, and I have reviewed that footage. The person in the footage who identified himself as DOZIER resembles

5

the person in the surveillance video from the 777 Arcade robbery, to include the tattoo that is visible on his upper left arm.

16. On July 25, 2019, Detective Hanson and I interviewed Stephanie Welch, DOZIER's ex-wife, who lives in Quincy, Massachusetts. Ms. Welch reviewed the photographs from the incident at the Best Arcade, and also of DOZIER purchasing bus tickets from Greyhound. Welch positively identified the suspect in all of the photographs as DOZIER, and signed all photographs presented to her. Ms. Welch informed me that when DOZIER was arrested by QPD on June 29, 2019, he was at her home in Quincy. Ms. Welch informed me that DOZIER uses the phone number 508-857-7748, and that she has known DOZIER to have used this number since as early as 2013, through the date of his arrest when he contacted her. Ms. Welch informed me that she observed QPD officers collect and package DOZIER's cellular telephone at the time of his arrest.

17. On July 25, 2019, I conducted database searches for documented contacts where the phone number 508-857-7748 had been provided. I learned that on June 16, 2019, DOZIER conducted a pawn transaction at Value Pawn, located at 905 Edgewood Avenue North, Jacksonville, Florida. During the course of the transaction, DOZIER provided the phone number 508-857-7748 to the Value Pawn employee as his phone number.

18. On July 25, 2019, I visited the Norfolk County Sheriff's Office, located at 200 West Street, Dedham, Massachusetts, and learned that DOZIER's cellular telephone, Florida driver's license, and other items found on his person on the date of his arrest were being held in secure property storage there. I personally inspected the cellular telephone to obtain its unique identifiable features, which are set forth in Attachment A.

### Investigators' Possession of the Equipment

19. The equipment is currently in the possession of the Norfolk County Sheriff's Office in Dedham, Massachusetts, and is being stored at its facilities, as described in Attachment A. Investigators obtained the equipment incident to DOZIER's arrest.

20. While investigators may already have all necessary authority to examine the equipment, I seek this additional warrant out of an abundance of caution to be certain that its search will comply with the Fourth Amendment and other applicable laws.

### Probable Cause to Believe That The Equipment Contains Evidence, Fruits, And Instrumentalities

21. As stated above, I have learned that DOZIER has used the cellular telephone number 508-857-7748 from as early as 2013 through the date of his arrest, and that QPD found a cellular telephone on DOZIER at the time of his arrest. Based on my investigation and my training and experience investigating violent crimes, I believe that DOZIER would have had this same telephone number and cellular telephone during the time of the commission of the armed robberies of the 777 Arcade and the Best Arcade on May 24, 2019, and June 19, 2019, respectively.

22. Based on my training and experience and the training and experience of law enforcement personnel who routinely handle this type of equipment, I understand that DOZIER's cellular phone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the law enforcement's possession.

23. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals carry out, communicate about, and store records regarding their daily activities on equipment like DOZIER's cellular phone. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, text

messages, and other forms of phone or internet-based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information on the internet; accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities

24. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals involved in the planning and execution of armed robberies communicate with each other through the use of cellular telephones like the equipment. Additionally, I am also aware that individuals involved in the planning and execution of armed robberies communicate using social media networking sites like Facebook, Snapchat, and WhatsApp, which can all be accessed through cellular telephones like the equipment.

25. I also know that many smartphones like the equipment (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, where the device was located during relevant dates and times and when certain messages were sent. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

26. Through my training and experience, I know that oftentimes individuals engaged in criminal activity will discard and/or replace old phones in an attempt to evade detection by law

enforcement or to prevent law enforcement from seizing digital evidence from a particular device. However, although an actual device may be switched by a suspect, information contained in and/or associated with the previous device can be transferred to the new device. This transfer of information usually occurs, amongst other reasons, because individuals generally continue to use the same Apple ID/Android ID (accounts designed to store a user's information) when switching between physical devices.

27. Based on my training, experience, and information provided to me by other law enforcement personnel, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and

virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

28.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

29.    The equipment is believed to have been utilized to coordinate the aforementioned crimes with facilitators and co-conspirators. This is because DOZIER fled from the scene of both robberies by entering the passenger side of the Ford Explorer or the sedan, respectively, which were each waiting outside, positioned in a manner to serve as a lookout and getaway vehicle. Furthermore, when investigators interviewed DOZIER's mother and informed her of DOZIER's involvement in the robberies, she indicated that she would contact DOZIER and have him turn himself into the Police. Instead, DOZIER bought a bus ticket leaving Jacksonville on that same day. Based on my training and experience, I am aware that cellular telephones (in general) are used during criminal offenses to create relevant documents, charts, pictures, or video; to send or receive relevant e-mails, text messages, or VOIP telephone calls; to set up or access relevant financial, cellphone, or other online accounts; and to communicate with co-conspirators or victims, etc.

## CONCLUSION

30.  Based on the information described above, I have probable cause to believe that DOZIER has violated 18 U.S.C. § 1951 and 18 U.S.C. § 924(c).

31.  Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the equipment described in Attachment A.

Sworn to under the pains and penalties of perjury,

_____
Joshua A. McLeod
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on 26th ___ of July 2019

_____
Honorable Jennifer C. Boal
United States Magistrate Judge